AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Middle District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>JEREMY P. ACHEY<br>a/k/a "Etiking" | )<br>)<br>)<br>)<br>)<br>)<br>) |

*Defendant(s)*

Case No.

6:17-mj- *1512*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ February 24, 2017 _____ in the county of _____ Orange _____ in the

_____ Middle _____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 843(b) | Distribution of a controlled substances and use of communication facilities in the commission of narcotics offenses. |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Mark S. Bruso, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___6/26/17___

_____
*Judge's signature*

City and state: _____ Orlando, Florida _____

Gregory J. Kelly, United States Magistrate Judge
*Printed name and title*

STATE OF FLORIDA

CASE NO.:  6:17-mj- 1512

COUNTY OF ORANGE

## AFFIDAVIT

I, Mark S. Bruso, being duly sworn, state the following:

## AGENT BACKGROUND

1.      I am a Special Agent ("SA") with the United States Drug Enforcement

Administration ("DEA") and have been assigned to the Orlando District Office since

October of 2015.  I am an investigative or law enforcement officer of the United

States within the meaning of Section 2510(7) of Title 18, United States Code, in that

I am empowered by law to conduct investigations and to make arrests for offenses

enumerated in 18 U.S.C. § 2516(1).

2.      I have participated in, and conducted investigations of, violations of

various state and federal criminal laws, including unlawful possession with intent to

distribute controlled substances, distribution of controlled substances, use of

communication facilities to commit narcotics offenses, conspiracy to import

controlled substances, and money laundering, all in violation of federal law.  Those

investigations have resulted in the arrests of individuals who have smuggled,

received, and distributed controlled substances, including cocaine, marijuana, heroin,

and methamphetamine.

3.      I have also conducted investigations concerning the identification of co-

conspirators through the use of telephone records and bills, financial records, drug

ledgers, and other pertinent documents.  I have executed search warrants for

controlled substances and have conducted surveillance in connection with numerous narcotics investigations. I have also participated in numerous Title III wiretap investigations and have been the Affiant on a Title III investigation. Further, your Affiant has utilized court-authorized prospective cell-phone location information in the investigation of narcotics offenses.

4.      I have debriefed and directed numerous confidential sources ("CSs"), cooperating witnesses ("CWs"), and sources of information ("SOIs") regarding narcotics investigations and the investigation of various crimes that arise from drug trafficking activities.  I have directed numerous CSs and CWs to successfully infiltrate narcotics enterprises by way of intelligence gathering, participation in consensual recordings, and monitored purchases of controlled substances. I am familiar with the ways in which narcotics traffickers conduct their business, including methods of importing and distributing narcotics, money laundering, the use of telephones to facilitate their illegal acts, and the use of codes to conduct drug transactions.

5.      I have been employed by the DEA since July 2002, when I attended the DEA Training Academy in Quantico, VA.  Following graduation from the DEA Academy, I worked in assignments in the Los Angeles, California, Field Division, the Special Operations Division, the Washington Division Office, the DEA Office of Training, and currently, the Miami Field Division's Orlando District Office.  Prior to my employment with DEA, I was employed as a local police officer in both the state of Massachusetts and the state of Florida from 1989 to 2001, and I attended the

Worcester Police Department Training Academy in Worcester, Massachusetts, from February 1989 to June 1989.

6.     This affidavit is submitted in support of the issuance of a criminal complaint and federal arrest warrant relating to violations of the following offenses, collectively referred to as the "Subject Offenses":

      (a)    distribution of analogues of controlled substances and controlled substances, in violation of 21 U.S.C. §§ 802(32)(A), 813 and 841; and

      (b)    use of communications facilities in the commission of narcotics offenses, in violation of 21 U.S.C. § 843(b).

## PURPOSE OF AFFIDAVIT

7.     I submit this affidavit based on information known to me personally from this investigation, as well as information obtained from others who have investigated the matter or have personal knowledge of the facts herein.  This affidavit is being submitted in support of the issuance of a criminal complaint and arrest warrant for **Jeremy P. ACHEY a/k/a "ETIKING"** for violations of the Subject Offenses.

## SUMMARY

8.     This investigation began after the overdose death of "Victim," in Orange County, Florida. Her fiancé, (hereinafter "Fiancé"), overdosed on the same substances, but survived. When he recovered, Fiancé explained that the couple ingested etizolam and tetrahydrofuran fentanyl that he purchased from a Dark Net

3

vendor named "ETIKING." Agents made three undercover purchases of various synthetic substances from ETIKING, each arrived in similar packaging with the same return address for "USDTO" on Upland Drive in Houston, Texas, and with labels printed using an online postage service. Lab tests were received on two of the substances purchased from ETIKING confirmed that they were controlled substance analogues, specifically 4-AcO-DMT, an analogue of psilocin, and 6-(2-Aminopropyl) benzofuran Hydrochloride, an analogue of MDMA. Agents also met with a confidential source who provided an identifier for a Bitcoin account used by ETIKING. Information provided by Coinbase.com (a Bitcoin exchanger) identified Jeremy ACHEY as a name frequently associated with that account. Coinbase.com records listed Jeremy ACHEY's address in Bethlehem, Pennsylvania. Agents began surveilling that address on June 21, 2017.

9.     That same day, agents saw ACHEY's wife drive to the Post Office and drop off two manila envelopes. Subsequent inspection of those envelopes revealed that they were affixed with labels matching the labels attached to the undercover purchases from ETIKING with the same return address for "USDTO" on Upland Drive in Houston, Texas. On June 22, 2017, agents watched ACHEY drive to the same Post Office with a white trash bag full of items. They subsequently learned that he had deposited twelve envelopes into the drop slot of the Post Office bearing the same labels as the undercover purchases with the same return address for "USDTO" on Upland Drive in Houston, Texas. ACHEY deposited these envelopes into the drop slot inside the Self-Service lobby of the Post Office.

## BACKGROUND INFORMATION AND DEFINITIONS

### A.    Controlled Substances Act.

10.    I am informed and believe that, in response to a growing problem of individuals, especially chemists, creating or designing substances that acted on the body like controlled substances, but were not yet listed on controlled substances schedules, Congress passed the Controlled Substance Analogue Enforcement Act of 1986.

11.    21 U.S.C. § 813 states that: "A controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in schedule I [of the Controlled Substances Act]."

12.    21 U.S.C. § 802(32)(A) provides the applicable definition for the term "controlled substance analogue."

13.    I am informed and believe that if a substance meets the following criteria, it constitutes a controlled substance analogue subject to control as if it was a scheduled controlled substance:

    a)    The substance has a chemical structure which is substantially similar to the chemical structure of a controlled substance in schedule I or II,

**and either:**

    b)    The substance has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to

5

or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II;

**or**

c)    A person represents or intends the substance to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

**and**

d)    The substance is intended for human consumption.

14.    Etizolam is a sythentic benzodiazepine. It is not currently a scheduled controlled substance. No determination has yet been made as to whether etizolam is a controlled substance analogue.

15.    Tetrahydrofuranfentanyl is a synthetic opiate. It is not currently a scheduled controlled substance. No determination has yet been made as to whether tetrahydrofuranfentanyl is a controlled substance analogue.

**B.    The "Dark Net" or TOR**

16.    I am aware that this case involves what is known as the "The Dark Net," the "Tor Network" or "Tor" for short.

17.    Through my training and experience, your affiant is aware that "The Dark Net" generally refers to an area of the Internet only accessible by using an encryption tool called The Onion Router (TOR). TOR is an open-source web browsing platform (free and easily downloaded from the Internet) which aims to conceal its users' identities and their online activity from surveillance and traffic analysis by separating identification and routing.  It is an implementation of onion routing, which encrypts and then randomly bounces communications through a network of relays run by volunteers around the globe.

18.    I am aware that "Dark Net" market places (such as AlphaBay, Dream, and Valhalla) can only be accessed through the use of a TOR browser. Unfortunately, TOR, originally developed in the mid-1990s by the United States Naval Research Laboratory to protect U.S. intelligence communications online, is now being used by criminal elements to conduct any number of criminal activities online, in relative secrecy.  Activities facilitated by Dark Net market places include, amongst others: credit card fraud, identity theft, illegal weapons sales, child exploitation, and drug trafficking.  TOR is often referred to as the "darkweb," for this very reason.

### C.    Bitcoin Virtual Currency

19.    I am aware that Bitcoin is a type of virtual currency, circulated over the Internet as a form of value.  Bitcoin are not issued by any government, bank, or company, but rather are generated and controlled through computer software operating via a decentralized, peer-to-peer network.  While Bitcoin exist primarily as

an Internet-based form of currency, it is possible to "print out" the necessary information and exchange Bitcoin via physical medium. Bitcoin is just one of many varieties of virtual currency.

20.     Bitcoin are sent to and received from Bitcoin "addresses" or "wallets." A Bitcoin address is somewhat analogous to a bank account number and is represented as a 26-to-35-character-long case-sensitive string of letters and numbers. Each Bitcoin address is controlled through the use of a unique corresponding private key, a cryptographic equivalent of a password or pin needed to access the address. Only the holder of an address' private key can authorize any transfers of Bitcoin from that address to other Bitcoin addresses.

21.     To transfer Bitcoin to another address, the payor transmits a transaction announcement, cryptographically signed with the payor's private key, across the peer-to-peer Bitcoin network. The Bitcoin address of the receiving party and the sender's private key are the only pieces of information needed to complete the transaction. These two keys by themselves rarely reflect any identifying information. As a result, little-to-no personally identifiable information about the payor or payee is transmitted in a Bitcoin transaction itself. Once the payor's transaction announcement is verified, the transaction is added to the "blockchain," a decentralized public ledger that records all Bitcoin transactions. The blockchain logs every Bitcoin address that has ever received a Bitcoin and maintains records of every transaction for each Bitcoin address.

22.     To acquire Bitcoin, a typical user will purchase them from a Bitcoin "exchanger." Bitcoin exchangers generally accept payments of fiat currency (currency that derives its value from government regulation or law), or other convertible virtual currencies.  When a user wishes to purchase Bitcoin from an exchanger, the user will typically send payment in the form of fiat currency, often via bank wire, or other convertible virtual currency to an exchanger, for the corresponding quantity of Bitcoin, based on a fluctuating exchange rate.  The exchanger, usually for a commission, will then either sell the user Bitcoin from the exchange's reserves or will attempt to broker the purchase with another user who is trying to sell Bitcoin.  The purchased Bitcoin are then transferred to the purchaser's Bitcoin address, allowing the user to conduct transactions with other Bitcoin users via the Internet.

23.     Virtual currencies, including Bitcoin, have known legitimate uses.  However, given the ease with which Bitcoin can be used to move funds with high levels of anonymity, Bitcoin can be used to facilitate illicit transactions and to launder criminal proceeds.  As is demonstrated herein, however, there some circumstances in which Bitcoin payments may be traced to individuals and entities by using the blockchain and other investigative methods.

## FACTUAL BASIS

21.     This affidavit does not include all of the information known to me as part of this investigation, but only information sufficient to establish probable cause that the above-mentioned violations of federal law have been committed.  Unless

otherwise noted, all statements of other persons described herein are set forth in substance and in part, rather than verbatim.

22. On March 8, 2017, DEA received information relating to an overdose death that occurred at xxxxx Morris Drive, Orlando, Florida on February 27, 2017. The OCSO medical examiner and OCSO Forensics responded to the scene. Based on reports from the OCSO, it was determined that Victim, and Fiancé, overdosed after consuming drugs that came in the United States Mail to xxxxx Morris Drive, Orlando, Florida. Victim was pronounced dead at the scene. Fiancé was transported to Florida Hospital East for an overdose.

23. OCSO Narcotics Agent Anthony Blackburn responded to the hospital and interviewed Fiancé who said that he purchased tetrahydrofuranfentanyl and etizolam online through the Dark Net. He stated that he used the liquid (etizolam) under the tongue and snorted the tetrahydrofuranfentanyl. The drugs ordered from the "Dark Net" and the packaging they came in were recovered. The package had "not for human or veterinary use" written on it and had a return address of "USDTO #6088, 1321 Upland Drive, Houston, TX 77043."

24. According to Fiancé, Victim ingested a small amount of tetrahydrofuranfentanyl and two minutes later she was on the couch. He explained that he tried to shake her, but she just flipped over. Fiancé attempted to get his phone but passed out.

25. On May 24, 2017, DEA agents received the medical examiner's report for Victim. The coroner listed the following conclusion in the report:

CONCLUSION: In consideration of the circumstances surrounding the death, and after examination of the body, and review of medical information found at the scene, it is my opinion that the death of [Victim], a 24 year old white female, is due to combined toxicity of tetrahydrofuranfentanyl and etizolam. The manner of death is classified as accident.

26.     On March 13, 2017, DEA agents retrieved the bottles of etizolam and sent them to the DEA Lab for testing.  On March 16, 2017, DEA agents took custody of the tetrahydrofuranfentanyl from the medical examiner's office and mailed it to the DEA Lab for testing. The DEA Lab confirmed that the substances were in fact etizolam and tetrahydrofuranfentanyl.

27.     On March 10, 2017, OCSO Homicide Detective Gina Adams and DEA TFO Andre Armendariz interviewed Fiancé at the OSCO in Orange County, Florida. Fiancé explained that he and Victim made the decision to order tetrahydrofuranfentanyl and etizolam from the Dark Net.

28.     Fiancé explained that the only thing he and Victim ingested on February 27, 2017, was the tetrahydrofuranfentanyl and etizolam purchased from a Dark Net vendor operating under the moniker "ETIKING." Fiancé explained that when he spoke to ETIKING about the tetrahydrofuranfentanyl, ETIKING said it is best if you snort it, shoot it, or smoke it. Fiancé said that ETIKING openly discusses the personal use (i.e. human consumption) of his products.

29.     Fiancé had an account on AlphaBay Market, a Dark Net marketplace, and volunteered to give law enforcement his password. Fiancé wrote down his username and password to his Dark Net AlphaBay Market account: barelygrylls55.

30.     Fiancé explained that he spoke to ETIKING via video chat and that ETIKING was a white male who looked to be about 27-35 years old.  Fiancé said that he was a regular customer of ETIKING and purchased substances from him at least six times in the previous year. According to Fiancé, every package he received from ETIKING had the same return address in Houston, Texas. He also stated that ETIKING always provides a tracking number for the package. Every time Fiancé checked the tracking number on items purchased from ETIKING, the United States Postal Service (hereafter "USPS") website stated that the package was accepted at the same zip code in Philadelphia.

31.     After the interview, DEA agents accessed the Dark Net and AlphaBay Market using Fiancé's account, barelygrylls55. The order history for the account confirmed that Fiancé did place an order with ETIKING on February 24, 2017.

32.     TFO Armendariz read the saved messages between Fiancé and ETIKING on the barelygrylls55 account confirming the order. The last message was from barelygrylls55/Fiancé on March 8, 2017, at 1:11 a.m. and read:

> hey I just saw this. I overdosed. which is crazy i didn't do much at all, that fentanyl, but my fiancé died on it, I was revived, she wasn't and didn't do much...u should probably up the price and put extra warnings on it . . . I know its our own fault, no one made us do that but still, its more dangerous then the internet lets on

33.     On March 29, 2017, TFO Armendariz used Fiancé's account on AlphaBay Market to communicate with ETIKING. Using Fiancé's account name, barelygryls55, TFO Armendariz wrote that he was having "withdrawls" and needed

another opiate. ETIKING responded that he has a product called "THP" that ". . . helps with op [opiate] withdrawal . . . ." Using the same account, TFO Armendariz also told ETIKING that I did not want to mess with the "th-fent" again, due to the fact that Victim may have died from consuming it. ETIKING responded that he only has "tetra FF." Based on my training and experience and knowledge of this investigation I believe that ETIKING has knowledge that Fiancé will consume the products ETIKING sells to him.

### First Undercover Purchase from ETIKING

34.    In addition to using Fiancé's account to communicate with ETIKING, DEA agents created a separate undercover account on AlphaBay Market to purchase substances from ETIKING.

35.    On March 24, 2017, TFO Armendariz utilized an undercover AlphaBay Market account on the Dark Net to purchase 1 gram of a product listed on ETIKING's AlphaBay store as "item# 268879, a 'Psychedelic' " for $80.00 (plus $7.00 for shipping) in Bitcoin.

36.    On March 27, 2017, a package containing a brown powder arrived at the undercover mailbox provided to ETIKING for the March 24, 2017, purchase. A label on the outside of the package read "4-AcO-DMT: 1g. IUPAC;3-[2-(Dimethylamino)ethyl]-1H-indol-4-yl acetate." Another label on the package listed a return address of "USDTO #6088, 1321 Upland Drive, Houston, TX 77043." On the same day TFO Armendariz "finalized" the order on AlphaBay Market, which released the Bitcoin out of the escrow account and to ETIKING.

13

37.     In May 2017 DEA received the lab results for the substance received on

March 27, 2017. The results were positive for 4-Acetoxy-N,N-dimethyltryptamine (4-

AcO-DMT), an analogue of psilocyn, a Schedule I controlled substance.

## Second Undercover Purchase from ETIKING

38.     On April 4, 2017, TFO Armendariz ordered 10 units of an item listed

on ETIKING's Dark Net store as "LSD" and paid in BITCOIN for the synthetic

drugs.

39.     Twelve tabs arrived on or about April 7, 2017, in the undercover mail

box in a small plastic bag with a label reading "ALD-52: IUPAC: (6aR,8R)-4-acetyl-

N,N-diethyl-7-methyl-4,6,6a,7,8,9-hexahydroindolo[4,3-fg]quinolone-9-

carboxamide"and another label stating "[n]ot for human or veterinary use." A label

on the package listed a return address of "USDTO #6088, 1321 Upland Drive,

Houston, TX 77043." On the same day TFO Armendariz "finalized" the order on

AlphaBay Market which released the BITCOIN out of the escrow account and to

ETIKING. Lab results are forthcoming.

## Third Undercover Purchase from ETIKING

40.     On April 18, 2017, TFO Armendariz utilized the undercover AlphaBay

Market account on the Dark Net to purchase 3 grams of a substance listed on

ETIKING's Dark Net store as "item# 216072 and sale# 8819712, 'Ecstasy/MDA' "

for $120.00 (plus $22.00 for Express Shipping) in Bitcoin.

41.    On April 21, 2017, DEA agents received a package in the undercover

mail box. Inside the package was brown powder inside a small plastic bag labelled

"6-APB; IUPAC: 1-(1-Benzofuran-6-yl)propan-2-amine" "[n]ot for human or

veterinary use," and "3g." A label on the package listed a return address of "USDTO

#6088, 1321 Upland Drive, Houston, TX 77043." On the same day TFO

Armendariz "finalized" the order on AlphaBay Market which released the Bitcoin

out of the escrow account and to ETIKING. Lab results confirmed that the

substance was "6-(2-Aminopropyl) benzofuran Hydrochloride," an analogue of

MDMA, a Schedule I controlled substance.

### Confidential Source

42.    On April 14, 2017, TFO Armendariz met with DEA Agents based in

Nashville. DEA Nashville Agents arranged for a confidential source (hereinafter

"CS"), to meet with agents with DEA Orlando regarding this investigation. DEA

Nashville Agents advised that the CS was well versed in the Dark Net, especially the

AlphaBay Market and the trafficking of synthetic research chemicals and/or analogs

of fentanyl.

43.    TFO Armendariz asked the CS if he/she was familiar with a person on

the Dark Net with the moniker, "ETIKING." The CS advised that the he/she was

the original ETIKING for approximately 18 months but sold 90 grams of furan

fentanyl, the username ETIKING, and the AlphaBay Market vendor account for

ETIKING to a person he/she knew only as "Eric" (hereafter referred to as

"ETIKING") in July or August of 2016 for $400.00 in Bitcoins.

44.    The CS explained that, at first, he/she worked with ETIKING and would have ETIKING fill all the orders that the CS was getting. The CS explained that they mostly communicated via encrypted messaging; however, ETIKING contacted the CS on the phone and through text on the CS's cell phone. The CS provided DEA agents with the cell phone number he/she used when ETIKING contacted him/her. The CS said that he/she remembered that ETIKING called from a phone number with a Philadelphia area code.

45.    The CS saved two messages in which ETIKING provided a private Bitcoin Wallet/address: 16ozAi11YWScC885FL5tDiUbhCLLt1FHeSu (hereinafter the "Wallet"). The CS also saved two messages where ETIKING sent the CS two USPS tracking numbers. TFO Armendariz checked both tracking numbers with the USPS and, according to those records, both packages were dropped off at the Lehigh Valley, Pennsylvania, USPS facility.

46.    In another meeting on April 21, 2017, the CS stated that in a recent conversation, ETIKING confirmed he had received tetrahydrofuran fentanyl from "LS," or LSResearchchemlab.com. The CS explained that LSResearchchemlab.com is distributing fentanyl analogues, and is based in China. The CS told Agents that LSResearchchemlab.com is a popular source of fentanyl analogues. During the discussion, ETIKING also confirmed that he had an additional 15 grams of the tetrahydrofuran fentanyl and was distributing it to his "regulars."

47.    On April 26, 2017, the CS advised that ETIKING sent a "temp.pm" message to the CS. The CS explained that "temp.pm" is a message that will automatically delete or "self-destruct" after it is initially opened. The "temp.pm" message from ETIKING read, "LS does not have much by that genre anymore only the U-49 U-48 and that's it. but we get better prices because of the K's we buy and pay 10% less then list. E." Agents have learned that "LS" refers to LSResearchchemlab.com.

48.    On May 5, 2017, DEA agents received information from the CS that ETIKING sent another "temp.pm" message to the CS. That message read, "O-Desmethyltramadol is selling pretty good right now, but not on here, have not been listing fents since like 5 people died in my state and the feds have upped their investigations, no doubt they are going to come to the darkweb looking for sellers, like to keep a lower profile then that. tetra was selling just as good as FU-f but can't get it anymore. best sellers outside that genre are DMT, 3MEO and APHP cannot stock those fast enough. E."

### Information obtained via Grand Jury Subpoenas and Other Process

49.    All of the packages sent by ETIKING and recovered in this case, i.e., the package purchased by Fiancé, and all three undercover purchases, had the same return address: USDTO# 6088 1321 Upland Dr., Houston, Texas 77043. The labels were created by a company named Shippo. A Grand Jury Subpoena was hand served to Shippo on May 15, 2017. A representative of Shippo explained that they created all the labels with the return address of USDTO# 6088 1321 Upland Dr., Houston,

Texas 77043; however, they subcontracted those labels to a company named Peppership, Inc., which runs a website called Stampnik.com that accepts Bitcoin as payment for the labels.  On the same day DEA Agents hand served a subpoena to Peppership, Inc.

50.     Stampnik.com is a website that sells USPS postage and labels online and accepts Bitcoin. Customers are required to sign-in with an email address and provide the shipping and return address. Labels can then be printed out at home by the customer.

51.     On May 17, 2017, DEA agents received an electronic copy of documents from Peppership/Stampnik.com in response to a Grand Jury Subpoena. According to the documents provided, the following emails were associated with the return address of 1321 Upland Drive, Houston, Texas 77043: brohemath@protonmail.com, getups@mail.com, getups@protonmail.com, onutra@protonmail.com, pbchems@protonmail.com, pbchems@ruggedinbox.com, stevemastermind76@yahoo.com, supern0va@protonmail.com, and usdto@riseup.net.

52.     On June 14, 2017, DEA agents received data from Coinbase.com in reference to a Grand Jury Subpoena requesting information associated with the Bitcoin "Wallet" that ETIKING gave to the CS. Coinbase.com identified four names associated with the Wallet. Three of those names conducted only one transaction with the Wallet. The fourth name, Jeremy ACHEY, conducted eight transactions with the Wallet.

53.     In order to use Coinbase.com, users are required to provide certain user information. Coinbase.com provided Jeremy ACHEY's user attributes. ACHEY listed his company as "USDTO," with the website of USDTO.org, as a "charity" and "sole proprietorship." ACHEY listed his company's address as 1321 Upland Drive #5495, Houston, Texas 77043. With the exception of the P.O. Box #5495, this is the same company and address that is listed on all labels for ETIKING's products including the labels from Fiancé's package and the three DEA undercover buys.

54.     Additionally, Coinbase.com records indicate that ACHEY listed "brohemath@ruggedinbox.com" and "brohemath@protonmail.com" as his personal email addresses. "[B]rohemath@protonmail.com" is one of the email addresses used by ETIKING to purchase labels from Stampnik.

55.     On the Coinbase.com user agreement, ACHEY listed his home address as xxxx E. 8th Street, Bethlehem, PA, 18015 (the "Premises").

### Surveillance of ACHEY on June 21, 2017

56.     On June 20, 2017, TFO Armendariz contacted a DEA Special Agent of the Allentown Resident Office and requested their assistance conducting surveillance on Jeremy ACHEY at his residence. On June 21, 2017, Agents/Officers of the Allentown Resident Office established surveillance the Premises.  Surveillance observed a 2003 White Chrysler Minivan, registered to Jeremy P. ACHEY at the Premises parked across the street from the residence. At approximately 3:00 p.m., TFO Vasa Faasuamalie observed Jeremy ACHEY exit the Premises and help a neighbor move a refrigerator into a neighboring residence. Jeremy ACHEY then

19

went back into the Premises. At approximately 3:30 p.m, Agent William Rodgers

observed a white female, later identified via a Pennsylvania driver's license photo the

wife of Jeremy ACHEY, sitting on the front porch of the Premises.

57.     At approximately 4:35 p.m., TFO Vasa Faasuamalie observed

ACHEY's wife walk off the porch of the Premises with a white plastic shopping bag

containing what appeared to be manila envelopes. She got into the white Chrysler

Minivan and pulled away. Agents followed the vehicle to the Post Office located at

the intersection of Wood St. and Broad St. in Bethlehem, Pennsylvania. Agent

Rodgers observed ACHEY's wife drive up to the drive-thru style blue mailbox and

place the manila envelopes into the slot.

58.     Agents notified the United States Postal Inspection Service about the

packages. At approximately 7:19 p.m., Agent Rodgers was informed that two

manila envelopes bearing the return address of "USDTO #6088, 1321 Upland Dr.,

Houston, TX 77043-4718" had been located and secured for the inspector to pick up

the following morning. On June 22, 2017, U.S. Postal Inspector Alfred Herzog took

possession of these two manila envelopes believed to contain shipments of analogue

chemicals from Jeremy ACHEY's Internet based trafficking, with the intention of

obtaining a federal search warrant in coordination with the DEA Orlando Office.

59.     TFO Armendariz reviewed a photograph of the aforementioned

packages and observed that they have the same return address as the DEA

undercover drug purchases as well as the label that was on the package sent to

Fiancé.

### Surveillance of ACHEY on June 22, 2017

60.     On June 22, 2017, Allentown Agents/Officers established surveillance of the Premises. At approximately 2:45 p.m., Agents William Rodgers observed Jeremy ACHEY walk off the porch of the Premises and head to his 2003 Chrysler Minivan. Agent Rodgers then observed ACHEY drive away from his residence. Surveillance units followed ACHEY towards the direction of the Bethlehem Post Office.

61.     At approximately 2:55 p.m., Agent Rodgers observed ACHEY drive up to the drive-thru blue mailbox in the parking lot of the Post Office. Agent Rodgers then observed ACHEY drive away but enter the last space in the lot and walk up to the entry door with a white trash bag, weighted down. SA Rodgers observed ACHEY walk inside the self-service lobby area. A short time later, agents saw ACHEY exit the post office without the white bag and walk back to the Chrysler Minivan. ACHEY drove away from the Post Office and, ultimately, back to his residence.

62.     Agent Rodgers informed U.S. Postal Inspector Alfred Herzog of the drop off and learned that there were twelve envelopes bearing the same return address of USDTO, 1321 Upland Dr., Houston, Texas 77043-4718. These envelopes were dropped by ACHEY in the drop slot inside the self-service lobby of the Post Office.

63.     Based on my investigation, I have learned that "1321 Upland Dr., Houston, TX 77043-4718" is the address of U.S. Global Mail, a mail forwarding

service that allows customers, typically expats, to receive mail in the United States.

Customers can view images of parcels that arrive and choose whether to have that

mail forwarded to another location.

## CONCLUSION

64.    Based on the above, I submit that probable cause exists to believe that

**Jeremy P. ACHEY a/k/a "ETIKING"** committed the Subject Offenses.

_____
Mark S. Bruso, Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me
this ___ day of June, 2017.

_____
Gregory J. Kelly
United States Magistrate Judge

22